IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| NAUTILUS INSURANCE COMPANY, | : | CIVIL ACTION NO. 1:12-cv-00038 |
| Plaintiff, | : | |
| v. | : | |
| STRONGWELL CORPORATION, | : | |
| Defendant. | : | |

**NAUTILUS INSURANCE COMPANY'S MEMORANDUM OF LAW
IN OPPOSITION TO STRONGWELL CORPORATION'S
MOTION TO PARTIALLY DISMISS FIRST AMENDED COMPLAINT**

Nautilus Insurance Company ("Nautilus"), by and through its counsel, hereby submits this memorandum of law in opposition to Defendant Strongwell Corporation's ("Strongwell") motion to dismiss Nautilus's First Amended Declaratory Judgment Complaint pursuant to this Court's October 31, 2012 Order regarding supplemental briefing.

**INTRODUCTION**

As set forth in the parties' briefing on Strongwell's motion to dismiss Nautilus's original Complaint, this is an insurance coverage dispute in connection with commercial general liability coverage provided by Nautilus to Strongwell. Strongwell, a provider of engineering services and manufacturer of fiberglass-reinforced composite materials, has tendered a demand for coverage arising from a suit filed against it by Black & Veatch ("B&V"), a global engineering, consulting, and construction company that provided services to American Electric Power Service

Corporation ("AEP") in connection with the design and construction of a number of power plant projects. B&V's complaint alleges that design and engineering work and related materials that Strongwell provided as part of a project to build jet bubble reactors ("JBRs") at one or more of these plants caused physical damage to the internal components of the reactors, requiring the repair and/or replacement of portions of those reactors, including Strongwell's product, itself.

Having agreed to defend Strongwell in the underlying action, subject to a full reservation of rights, Nautilus then commenced this declaratory judgment. The declaratory judgment action asserts that Strongwell is not entitled to defense or indemnification because, among other things, (1) there is no "occurrence" under the policies and/or applicable law; (2) "any claim is barred under one or more policy exclusions, including but not limited to the Damage to Your Product and/or Your Work Exclusions; Damage to Impaired Property or Property Not Physically Injured Exclusion, Recall of Products, Work or Impaired Property Exclusion; Contractual Liability Exclusion; and Expected or Intended Injury Exclusion . . . ."

In response, Strongwell moved to dismiss Nautilus's Complaint insofar as it seeks a declaration that there is no duty to defend, and otherwise moved to stay the litigation pending the outcome of the underlying B&V litigation against Strongwell. On October 31, 2012, after the parties' had briefed and argued Strongwell's motions to partially dismiss and/or stay, this Court granted Nautilus's oral motion to amend its Complaint to assert an additional defense under the Policies' Professional Liability Exclusions. After Nautilus filed its Amended Complaint, Strongwell again moved to partially dismiss and/or stay, addressing the new issues raised regarding the Professional Liability Exclusion, reiterating arguments raised in its prior briefing, and otherwise relying upon the arguments made in support of its motion to dismiss the original Complaint.

This memorandum of law addresses Strongwell's latest arguments and otherwise relies upon, and incorporates by reference, Nautilus's Memorandum of Law in Opposition to Strongwell's Motion to Partially Dismiss [Docket No. 18] and Memorandum of Law in Opposition to Strongwell's Motion to Stay [Docket No. 19]. In short, for the reasons discussed in those briefs, the coverage issues in this case do not implicate and/or will not be resolved in the underlying litigation, and, thus, there is no reason to require the contours of the underlying complaint to dictate Nautilus's coverage obligation through resolution of that litigation once facts extraneous to that matter establish that there is no coverage under the applicable policy. Moreover, as set fort forth below, Nautilus has no duty to defend or indemnify under the Professional Liability Exclusion because Strongwell's alleged liability in the underlying litigation arises from, or is inextricably intertwined with, Strongwell's rendering of, or failure to render, a "professional service," including the design and engineering of the JBR Projects. Granting Strongwell's motions to partially dismiss and/or stay would undermine the very purpose of declaratory relief, which is to guide or direct a party's future conduct before a loss occurs.

**FACTUAL BACKGROUND**

Nautilus's prior Memorandum of Law in Opposition to Strongwell's Motion to Dismiss detailed the factual allegations and claims B&V asserted against Strongwell and relevant policy terms and exclusions, and Nautilus relies upon and incorporates that brief by reference here. However, to briefly recap, B&V entered into a series of agreements with American Electric Power ("AEP") to design and construct eight JBR projects for power plant projects owned by AEP in Ohio and Indiana. Am. Compl. ¶¶ 11, 19. By mid 2005, "Black & Veatch sought bidders for design, supply, and erection of the internal portions of the JBR Projects," *id.* at 20,

3

and by the beginning of early 2006, had entered into a series of contracts with MTI to perform that work. *Id.* at 41. As expected by B&V, MTI, in turn, subcontracted the design, manufacture, and supply of certain FRP materials for the JBR Projects (e.g., beams, columns, decks, grating, and connections) to Strongwell. *Id.* at 43. After alleged defects in Strongwell's products and work were reported by AEP, B&V ultimately reached a settlement with AEP to repair and replace certain components of the JBRs that were damaged. *Id.* at 69. This lawsuit brought by B&V against Strongwell followed -- with an amended complaint including counts for (1) breach of express warranty; (2) failure to conform to express warranty; (3) breach of implied warranty in tort; (4) negligent misrepresentation; (5) strict product liability for manufacturing defect; (6) negligence; (7) product liability for failure to warn; (8) common law failure to warn; (9) professional negligence; and (10) indemnity.[1] *Id.* ¶¶ 72-176.

Upon tendering its claim in connection with the underlying suit to Nautilus for coverage, Nautilus agreed to provide Strongwell with a defense pursuant to a full reservation of rights. It then brought this declaratory judgment action. On September 20, 2012, Strongwell filed a motion to dismiss Nautilus's count for declaratory relief relating to the duty of defense -- along with a motion to stay the lawsuit. After fully briefing and arguing Strongwell's motions, on October 31, 2012, this Court issued an order permitting Nautilus to file an amended complaint. On September 11, Nautilus filed its First Amended Complaint, raising the policies' Professional Liability Exclusion as an additional defense to coverage.[2] That exclusion provides, in pertinent part, as follows:

---

[1] The original complaint included counts for negligence and indemnification only.

[2] Nautilus also included a short revision to paragraphs 38 and 39 relating to the Policies' requirement that "property damage" must occur during the policy period. Strongwell does not include any additional arguments relating to this paragraph in support of its renewed motion to dismiss.

4

> It is agreed that this policy shall not apply to liability arising out of the rendering of or failure to render professional services, or any error or omission, malpractice or mistake of a professional nature committed by or on behalf of the Named Insured in the conduct of any of the Insured's business activities.

Policy, Professional Liability Exclusion Endorsement. In response, Strongwell has renewed its motion to partially dismiss and/or stay the declaratory judgment action. For the reasons that follow, and for the reasons that Nautilus has already explained in its prior briefing, Strongwell's motions must fail.

## ARGUMENT

In response to Strongwell's renewed motion to dismiss and/or stay, Nautilus relies upon, and incorporates by reference, Nautilus's Memorandum of Law in Opposition to Strongwell's Motion to Partially Dismiss [Docket No. 18] and Nautilus's Memorandum of Law in Opposition to Strongwell's Motion to Stay [Docket No. 19]. Nautilus maintains that Strongwell's motion to partially dismiss the First Amended Complaint, insofar as Nautilus seeks a declaration on the duty to defend, is premature since Nautilus continues to defend Strongwell in the underlying litigation. In the event, however, that this Court decides to reach and consider the merits of Strongwell's argument on the defense obligation, Nautilus's prior briefing establishes, among other things, that there is no "Occurrence" under the Policies and that various exclusions may preclude coverage, even under the "Eight Corners" analysis for determining whether there is a duty to defend. The Professional Liability Exclusion, addressed below, buttresses this argument. Moreover, contrary to Strongwell's assertion, addressing these issues now, rather than after the underlying litigation is resolved, will not interfere with the conduct of that litigation and, more importantly, will serve a useful purpose in guiding or directing the parties' future conduct regarding settlement.

### A. Strongwell Cannot Prevail on its Motion to Dismiss Because Nautilus Has Stated a Claim for Declaratory Relief in Connection With its Duty to Defend

#### 1. There is No Duty to Defend Under the Professional Liability Exclusion

Before conducting the duty to defend analysis and comparing the allegations in the underlying complaint to the policy language, the Court must determine the meaning of the policy language. *VEPCO v. Northbrook Property & Cas. Ins.*, 475 S.E.2d 264 (Va. 1996). "Courts interpret insurance policies, like other contracts, in accordance with the intention of the parties gleaned from the words they have used in the document." *Seals v. Erie Ins. Exch.*, 674 S.E.2d 860 (Va. 2009) (quoting *Floyd v. N. Neck Ins. Co.*, 427 S.E.2d 193 (Va. 1993)). Therefore, a "court must adhere to the terms of a contract of insurance as written, if they are plain and clear and not in violation of law or inconsistent with public policy." *Blue Cross & Blue Shield v. Keller*, 450 S.E.2d 136 (Va. 1994). The Virginia courts "interpret the unambiguous terms of a contract according to their plain meaning." *Uniwest Constr., Inc. v. Amtech Elevator Servs.*, 699 S.E.2d 223 (Va. 2010).

It is well established that to determine the scope of a "professional services" provision "courts must look to the nature of the insured's act or conduct," to determine whether the insured's act "arise[s] out of the rendering or failure to render . . . 'professional services.'" *See Bohreer v. Eire Ins. Group*, 475 F.Supp. 2d 578 (E.D.Va. 2007). In other words, courts must determine whether the action arises out of service that 'exacts the use or application of special learning or attainments of some kind. *Id.* at 585. Moreover, Virginia courts have construed "professional services" broadly. *See, e.g., Cont.'l Cas. Co. v. Burton*, 795 F.2d 1187, 1190 (4th Cir. 1986) ("For the purpose of determining coverage of a professional liability policy the test is

6

whether the attorney was engaged for legal services by a client who subsequently entrusted him with money for investment.").[3]

In pertinent part, the Professional Liability Exclusion included in the subject policies precludes coverage for liability "arising out of the rendering of or failure to render professional services…." Policy, Professional Liability Exclusion Endorsement. In this case, and contrary to Strongwell's assertion that its services were merely "routine quality control steps required of any manufacturer," in Count IX of the Amended Complaint for "Professional Negligence," B&V clearly states that "Strongwell undertook to perform design and engineering services for the JBR Projects" and that "Strongwell knew or reasonably should have known that Black & Veatch would be relying on Strongwell's engineering work regarding its products and the JBRs. . . ." Am. Compl. at pars. 165-66.

Moreover, and in addition to an entire count focused solely on Strongwell's alleged "Professional Negligence," Am. Compl. at Count IX, B&V's amended complaint is replete with references to the engineering and design work that Strongwell performed -- and that B&V expected it to perform -- in connection with the building of the JBRs. Specifically, the amended complaint contains the following relevant allegations:

- MTI and Strongwell collaborated with each other to review the basic information regarding Chiyoda's JBR design and to assess the possibility of building JBRs using Strongwell' FRP products. Am. Compl. at ¶ 25.

- MTI and Strongwell concluded that they could work together to *design*, supply, and erect JBRs for Black & Veatch on the JBR Projects. *Id.* at ¶ 26

---

[3] Strongwell contends that such cases were decided "based on a rule that construes the provision in favor of coverage [and] are not necessarily applicable to the construction and application of a policy exclusion." Strongwell Brief at 3. However, Virginia courts have endorsed a similarly broad reading of the phrase "professional services" when applying the professional services exclusion. *See supra Bohreer*.

7

- During the latter half of 2005, MTI and Strongwell had multiple meetings and conversations with Black & Veatch regarding the design, supply, and erection of the JBR Projects.  *Id.* at ¶ 31.

- MTI and Strongwell told Black & Veatch in 2005 that Strongwell would be the entity to supply FRP materials for the JBRs, to provide information and technical data regarding configuration and performance of the FRP materials in the JBRs, and to verify that the proposed FRP materials would (a) function as intended in the JBRs, (b) be suitable for use in the JBRs, and (c) comply with Black & Veatch's written specifications for the JBR Projects.  *Id.* at ¶ 38.

- Strongwell knew that Black & Veatch, though an engineer itself, did not have applicable expertise in pultruded FRP composolites.  *Id.* at ¶ 39.

- Strongwell knew that Black & Veatch would rely on Strongwell to provide clear, accurate, and complete information regarding the capabilities, characteristics, and appropriate use of Strongwell's FRP materials on the JBR Projects.  *Id.* at ¶ 40.

- MTI's subcontracts with B&V "required MTI to design, supply, fabricate, and erect materials for the JBR Projects. . . .," and "MTI subcontracted the *design*, manufacture, and supply of certain FRP materials for the JBR Projects to Strongwell, such as beams, columns, decks, grating, and connections."  *Id.* at ¶¶ 42 and 43.

- "As part of its subcontracted responsibility for the JBR Projects, Strongwell furnished to MTI a series of verified calculations and drawings for the JBR Projects."  *Id.* at ¶¶ 45-50.

- "Strongwell furnished MTI with its verified calculations and drawings with the knowledge and intent that MTI would give the calculations and drawings to Black & Veatch."  *Id.* at ¶ 51.

B&V's amended complaint certainly also refers to Strongwell's ultimate manufacture and supply of FRP component parts.  However, this was not the usual situation in which a subcontractor supplies garden variety widgets to its customer -- or for the benefit of its end user -- with no additional input or professional judgment as to its end use.  To the contrary, it is clear that it was Strongwell's expertise in designing and engineering those parts for specific application/installation in the JBRs that motivated B&V's decision to contract with MTI:

8

- "In order for Black & Veatch to award the JBR Projects to MTI, Black & Veatch sought to satisfy itself that MTI, *with its 'partner' Strongwell*, would be able to build MTI's variant of the Chiyoda design concept with a design and materials that complied with Black & Veatch's written specifications for the JBR Projects."  *Id.* at ¶ 36.

- "Strongwell knew that Black & Veatch, though an engineer itself, did not have applicable expertise in pultruded FRP composites."  *Id*. at ¶ 39.

- Strongwell furnished MTI with its verified calculations and drawings with the knowledge and intent that MTI would give the calculations and drawings to Black & Veatch."  *Id*. at ¶ 51.

If, as Strongwell alleges, its services were relegated to that of "routine quality control" -- not falling within the broad scope of the professional liability exclusion -- then there would have been no reason for B&V to emphasize its reliance on Strongwell's specific areas of expertise and to base its contracting decisions thereon, particularly when B&V admits that it is an engineer, itself.  Moreover, in this situation -- where the primary motivation behind a business deal for goods and services relates to the services provided -- the professional services exclusion should apply to bar coverage.

Virginia courts have not had the opportunity to directly address the issue before this Court -- i.e., whether a professional services exclusion precludes coverage where an insured is alleged to have provided both professional services and something other.  In *Harbor Ins. Co. v. Omni Const., Inc.* 912 F.2d 1520 (D.C. Cir. 1990), however, the District Court Circuit Court of Appeals concluded that a professional services exclusion unambiguously excluded loss caused by the insured's rendering of a professional engineering service, regardless of whether the insurer also performed related construction work.  *Id.* at 1525.  In that case the insured construction company was engaged to construct an office building and parking garage on a lot

9

adjacent to a building owned by Sears. *Id.* at 1521. During the course of excavation activities the Sears building incurred settlement damage.

The insured agreed to repair the damage and then sought to recover the cost of the repairs from Harbor. The insurer rejected the claim, contending that the damage was caused by an error in the design of the sheeting and shoring system that the insured's subcontractor had designed and installed to protect adjacent structures. The insured countered that the shoring system was not a professional service as the design work was part of its "means and methods" of construction services. *Id.* at 1522. The insured explained that, in the custom of the construction industry, "professional services" performed by a subcontractor incidental to its construction work are referred to as "means and methods of construction" rather than as "professional services." *Id.* Accordingly, the insured argued, the exclusion must be read in accordance with the reasonable expectation of the insured. *Id.* The court rejected this argument, concluding that the exclusion unambiguously excluded coverage for loss caused by the rendering of a professional service, regardless of whether it is performed by a firm in the course of providing related non-professional work. The court reasoned that if "professional services" did not include professional services rendered as "construction means and methods," then the exclusion would be meaningless. *Id.*

Here, it is clear that the crux of B&V's amended complaint relates to professional services provided by Strongwell. Accordingly, Nautilus does not have a duty to defend under the Eight Corners Rule and, accordingly, Strongwell's motion to partially dismiss should be denied.[4]

---

[4] If there is no duty to defend, of course, there is no duty to indemnify as a matter of law. *See Builders Mut. Ins. Co. v. The Futura Group, LLC*, 779 F. Supp.2d 529, 534 (E.D. Va. 2011) ("if there is no duty to defend, there can be no duty to indemnify."). If, however, this Court

10

### B.     Staying This Litigation Would Defeat the Purpose of Seeking Declaratory Relief, which is to Guide the Parties' Future Conduct

In its renewed motion, Strongwell returns to its refrain that this action should be stayed lest resolution of the coverage issues in this case somehow interfere with its defense in the underlying suit. This argument, however, is a red herring. For example, contested facts concerning "when the components were damaged" may be irrelevant to this coverage determination if it turns out that the dates posited by each side are *both* outside the relevant policy period. Similarly, if disputes concerning the "specific components that were damaged" only involve component parts manufactured and supplied by Strongwell (e.g., in addition to Strongwell's Composolite, Strongwell also provided its "Extren" and "Duragrate" products for use in constructing the JBRs, see Am. Comp. at ¶ 56) then one or more of the business risk exclusions might apply without the need to resolve that issue at all. *See, e.g.,* Damage to Your Product exclusion ("'Property damage' to 'your product' arising out of it or any part of it.'") Finally, even facts relating to causation are not going to be relevant to all of Nautilus' coverage defenses (for example, the contractual liability provision should this Court conclude that it cannot be resolved under an eight corners review).[5] Furthermore, to the extent that some of these so-called "hotly-contested" factual issues may not even be adjudicated in the underlying case (since they do not go to the ultimate issue of fact), there is certainly no harm in pursuing them as part of this coverage suit.

---

determines that there is a duty to defend, Nautilus reserves the right to address the indemnity issues -- which are not before this Court on this motion -- based upon the relevant Policy terms and exclusions and the record developed in discovery.

[5] Indeed, to the extent that the Recall of Products exclusion requires only that a product be withdrawn from use because of a known or *suspected* defect. . . .," a determination of causation in the underlying litigation is not relevant there at either.

As Nautilus is continuing to pay for Strongwell's defense in the underlying litigation, it obviously appreciates the scope and expense of Strongwell's efforts to defend itself and does not necessarily seek to reinvent the wheel. Where appropriate and sufficient, discovery from the underlying litigation may be relied upon in proceeding with and resolving the instant coverage litigation. However, there is no reason to preclude this coverage suit from moving forward now when doing so will only perpetuate uncertainty among the parties concerning not just Nautilus' continuing duty to defend -- but whether or not, at the end of the day, Strongwell will even be entitled to indemnity coverage (and, if so, how much) should it ultimately desire to settle or be faced with a verdict entered against in the underlying suit[6] *Penn-America Ins. Co. v. Coeffey*, 368 F.3d 409, 413 (4th Cir. 2005) ("a declaratory judgment is appropriate 'when the judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.").

Therefore, Strongwell's Motion to Stay should be denied.

---

[6] Strongwell misleadingly argues that this case is "no different than an automobile accident case in which the insured is alleged to have negligently run a red light, but the insured denies liability and insists that the light was green." Strongwell Brief at 8. Strongwell contends that "Nautilus effectively takes the position that it should be permitted to litigate the issue of whether the light was red or green . . . ." *Id.* On the contrary, to continue Strongwell's analogy, Nautilus's concern in seeking declaratory relief is not whether the light was red or green, but rather, is more akin to whether the driver of the automobile was even covered under the policy at issue.

12

**CONCLUSION**

For the reasons set forth above, Nautilus respectfully requests that Strongwell's Motion to Dismiss the First Amended Complaint and Motion to Stay be denied.

Respectfully submitted,

/s/ John P. Fishwick, Jr.
John P. Fishwick, Jr.
Lichtenstein Fishwick, PLC
Monica L. Mroz
101 S. Jefferson St., Suite 400
P.O. Box 601
Roanoke, Virginia 24001-0601
(540) 343-9711
(540) 343-9713 facsimile
jpf@vatrials.com

Of counsel:

Ronald P. Schiller
Nicole J. Rosenblum
Michael R. Carlson
HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, Pennsylvania 19103
(215) 568-6200
(215) 568-0300 facsimile
rschiller@hangely.com
nrosenblum@hangley.com
mcarlson@hangley.com

Dated: December 4, 2012

**CERTIFICATE OF SERVICE**

I, John P. Fishwick, Jr., certify that on December 4, 2012, a copy of the foregoing memorandum of law in opposition to Strongwell Corporation's Motion to Partially Dismiss First Amended Complaint was electronically filed with the Court today using the CM/ECF system which will send notice of this filing to:

> Mark D. Loftis, Esq.
> Woods Rogers PLC
> 10 South Jefferson Street, Suite 1400
> P.O. Box 14125
> Roanoke, VA 24038
> Telephone:  540-983-7600
> Facsimile:   540-983
> loftis@woodsrogers.com

/s/ John P. Fishwick, Jr._____
John P. Fishwick, Jr.

14