CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUN 05 2013

JULIA C. DUDLEY, CLERK
BY: /s/
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | |
|---|---|
| NAUTILUS INSURANCE COMPANY, | Civil Action No. 1:12CV00038 |
| Plaintiff, | **MEMORANDUM OPINION** |
| v. | By: Hon. Glen E. Conrad |
| STRONGWELL CORPORATION, | Chief United States District Judge |
| Defendant. | |

In this insurance coverage dispute, Nautilus Insurance Company ("Nautilus") seeks a declaratory judgment that it has no obligation to defend or indemnify Strongwell Corporation ("Strongwell") in connection with a lawsuit that Black & Veatch Corporation ("Black & Veatch") filed against Strongwell in the United States District Court for the Western District of Missouri. The case is presently before the court on two motions filed by Strongwell. Specifically, Strongwell has moved to dismiss the amended complaint insofar as it seeks a declaration that Nautilus owes no duty to defend Strongwell against Black &Veatch's claims. Strongwell has also moved to stay the action insofar as it seeks a determination of whether Nautilus owes a duty to indemnify Strongwell. For the reasons set forth below, the motion for partial dismissal will be granted and the motion to stay will be granted in part and denied in part.

## Background

### I. The Underlying Action

On January 23, 2012, Black & Veatch filed suit against Strongwell in the Western District of Missouri. According to the amended complaint in the underlying action, Black & Veatch agreed to construct several jet bubbling reactors ("JBRs") for power plant projects owned by

American Electric Power Service Corporation ("AEP"). Black & Veatch then entered into a series of subcontracts with Midwest Towers, Inc. ("MTI"), which agreed "to design, supply, and erect the internals for the JBR Projects." (Black & Veatch Am. Compl. at ¶ 41.) In turn, MTI "subcontracted the design, manufacture, and supply of certain [fiberglass reinforced plastic "FRP"] materials for the JBR Projects to Strongwell, such as beams, columns, decks, grating, and connections." (Id. at ¶ 43.)

According to Black & Veatch's amended complaint, Strongwell provided various calculations and drawings to MTI, and MTI then "attempted to fulfill its supply obligations under the MTI Subcontracts by buying pultrated FRP material from Strongwell in the form of Extren, Composolite, Duragrate, and other Strongwell-manufactured FRP." (Id. at ¶ 53.) Strongwell sold and delivered these products to MTI, and MTI then "used Strongwell's products to perform its scope of work and to erect the JBRs." (Id. at ¶ 56.)

Black & Veatch claims that "numerous defects in Strongwell's FRP materials and work were discovered" after three of the JBRs went into operation. (Id. at ¶ 58.) For instance, "Composolite decks began to deteriorate at an alarming rate," and "[p]ortions of the Composolite failed, collapsed, cracked, deformed, or deflected substantially." (Id.) Black & Veatch alleges that one of the JBRs, known as "Cardinal 1," experienced four outages from November 2008 through September 2009 in order "to repair physical damages resulting from deficiencies discovered in the JBRs." (Id. at ¶ 59.) Another JBR, known as "Cardinal 2," "experienced six outages between December 2008 and August 2009, four of which were unscheduled, to repair physical damages resulting from deficiencies discovered in the JBRs." (Id.) Black & Veatch alleges that, "[a]s a result of defects in the material and work provided by Strongwell, there was

widespread physical damage to the Cardinal 1 and Cardinal 2 JBRs." (Id. at ¶ 61.) Black & Veatch further alleges that defective decks supplied by Strongwell at three other JBRs "could not be replaced without extensive damage to other property." (Id. at ¶ 63.) Pursuant to a settlement reached with AEP, Black & Veatch "agreed to repair and replace the material and work of Strongwell and to repair and replace all of the physical damage caused by the material and work of Strongwell on the JBR Projects," resulting in the expenditure of millions of dollars by Black & Veatch. (Id. at ¶ 69.)

Black & Veatch's amended complaint contains ten separate counts against Strongwell. The counts include claims for breach of express warranty; failure to conform to express warranty; breach of implied warranty in tort; negligent misrepresentation; strict product liability for manufacturing defect; negligence; product liability for failure to warn; common law failure to warn; professional negligence; and indemnity.

## II. The Insurance Policies

Nautilus issued two commercial general liability policies to Strongwell: Policy No. BK00102973, for the policy period of December 31, 2007 to December 31, 2008; and Policy No. BK00102974, for the policy period of December 31, 2008 to December 31, 2009 (collectively, "the policies"). The policies' insuring clause obligates Nautilus to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." (Policies at § I, ¶ 1(a).) The policies further provide that Nautilus "will have the right and duty to defend the insured against any 'suit' seeking those damages." (Id.)

The policies define "property damage" as "physical injury to tangible property, including all resulting loss of use of that property." (Id. at § V, ¶ 17(a).) The policies cover such property

3

damage occurring during the policy period, if the property damage results from an "occurrence," which the policies define as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Id. at §§ I, ¶ 1(b) & V, ¶ 13.)

The policies contain a number of exclusions. The policy exclusions at issue in this case are those for "Damage To Your Product," "Damage To Your Work," "Damage To Impaired Property," "Recall Of Products, Work Or Impaired Property," "Contractual Liability," and "Professional Liability."

### III. The Instant Action

After the underlying action was initiated by Black & Veatch, Strongwell tendered a claim for defense and/or indemnification to Nautilus under one or both of the policies. Nautilus agreed to defend Strongwell under a reservation of rights. Nautilus then commenced this action, requesting a declaratory judgment that it does not have the obligation to defend Strongwell, or to indemnify Strongwell for any judgment that Strongwell might be required to pay.

Strongwell subsequently moved to dismiss Nautilus's complaint insofar as it requested a declaration that Nautilus has no duty to defend Strongwell in the underlying action. Strongwell also filed a motion to stay the case insofar as Nautilus requested a declaration that it owes no duty to indemnify Strongwell.

The court held a hearing on the motions on October 25, 2012. At the conclusion of the hearing, Nautilus requested and was granted leave to file an amended complaint. Following the filing of the amended complaint, Strongwell again filed a motion for partial dismissal and a motion to stay.[1] Those motions have been fully briefed and are ripe for consideration.

---

[1] Given this procedural history, Strongwell's partial motion to dismiss the original complaint and its initial motion to stay will be dismissed as moot.

4

## Discussion

### I.    Motion for Partial Dismissal

Strongwell has moved to dismiss the amended complaint insofar as it seeks a declaration that Nautilus owes no duty to defend Strongwell in the action brought by Black & Veatch. Under Virginia law,[2] the determination of whether an insurer has a duty to defend "depends on comparison of the policy language with the underlying complaint 'to determine whether any claims alleged [in the complaint] are covered by the policy.'" Superformance Int'l, Inc. v. Hartford Cas. Ins. Co., 332 F.3d 215, 220 (4th Cir. 2003) (quoting Fuisz v. Selective Ins. Co. of Am., 61 F.3d 238, 242 (4th Cir. 1995) (alteration in original)). This is commonly referred to as the "eight corners rule," since it requires the court "to compare the four corners of the insurance policy against the four corners of the underlying complaint [to determine] if any allegations may potentially be covered by the policy." CACI Int'l, Inc. v. St. Paul Fire and Marine Ins. Co., 566 F.3d 150, 153 (4th Cir. 2009) (alternation in original) (internal citation and quotation marks omitted).

The insured bears the burden of proving coverage under the policy. Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 636 (4th Cir. 2005). However, "this burden is not especially onerous since the insurer must defend unless it clearly appears from the [allegations in the underlying action] that the insurer would not be liable under the policy contract for any judgment based upon the allegations." Id. (emphasis in original) (internal citation and quotation marks omitted). Because the duty to defend "arises whenever the complaint against the insured alleges facts and circumstances, some of which, if proved, would fall within the risk covered by the policy," the duty to defend is broader than the duty to indemnify. Brenner v. Lawyers Title

---

[2] The parties agree that Virginia law governs the disposition of this issue.

5

Ins. Corp., 397 S.E.2d 100, 102 (Va. 1990). "Indeed, an insurer may be required to provide a defense even where the ultimate resolution of the case demonstrates that the insurer is not liable for indemnification." Fuisz, 61 F.3d at 242.

A. **The Timing of the Motion**

Prior to considering the merits of Strongwell's motion for partial dismissal, the court must first address Nautilus's arguments regarding the timing of the motion. Specifically, Nautilus contends that the motion is "unnecessary," since Nautilus is currently defending Strongwell in the underlying action filed by Black & Veatch. (10/15/12 Br. in Opp'n at 11.) Nautilus also argues that the motion is "premature," in that that the resolution of the duty-to-defend question "can be more conclusively ascertained by resort to evidence outside of the so-called 'eight corners' – as developed through discovery in this coverage action." (Id. at 11.) For the following reasons, the court finds both arguments unpersuasive.

While Nautilus continues to defend Black & Veatch's claims against Strongwell under a reservation of rights, Nautilus expressly denies that it has a duty to defend Strongwell, and has requested that this court declare that such a duty does not exist. (Am. Compl. at ¶ 2-3.) Consequently, the court is unable to conclude that a ruling on this issue is unnecessary. See, e.g., Penn. Nat'l Mut. Cas. Ins. Co. v. Cochrane Roofing & Metal Co., Inc., No. 2:11-cv-124, 2011 U.S. Dist. LEXIS 155992, at *6 (N.D. Ala. Apr. 20, 2011) ("Here, Cochrane invoked Penn National's duty to defend, and, although Penn National continues to defend the claim under a reservation of rights, Penn National denies that such a duty exists. As such, there is unquestionably a ripe, live controversy on that issue.") (internal citations and quotation marks omitted).

The court must also reject the argument that the motion to dismiss is premature. As set forth above, this court must apply the eight corners rule in determining whether Nautilus has a duty

to defend Strongwell. Under this rule, as the Supreme Court of Virginia recently reiterated, "only the allegations in the [underlying] complaint and the provisions of the insurance policy are to be considered in deciding whether there is a duty on the part of the insurer to defend the insured." AES Corp. v. Steadfast Ins. Co., 725 S.E.2d 532, 535 (Va. 2012) (emphasis added).

Like the insurer in Capitol Environmental Services, Inc. v. North River Insurance Company, 536 F. Supp. 2d 633, 642 (E.D. Va. 2008), Nautilus "has offered no persuasive authority in support of its proposed rule that an insurer may rely on extrinsic facts to deny its duty to defend when the eight corners rule would otherwise require it to defend." As the district court emphasized in that case, "[a]llowing an insurer to point to facts outside the pleadings to demonstrate that it would ultimately have no duty to indemnify as proof that it has no duty to defend would render the two duties indistinguishable and thus effectively depreciate the duty to defend." Id. (emphasis in original).

The only Virginia case cited by Nautilus -- Copp v. Nationwide Mutual Insurance Company, 692 S.E.2d 220 (Va. 2010) -- provides no support for the proposition that an insurer may rely on extrinsic evidence to deny the insured a defense. Instead, based on a particular exception to an exclusion found in the policy at issue, the Copp Court varied from the eight corners rule and considered extrinsic evidence that triggered an insurer's duty to defend. Id. at 225. Specifically, the policy exclusion contained a self-defense exception, under which damage caused by an insured trying to protect his person or property would not be excluded from coverage. Id. Given this particular exception, which expressly contemplated consideration of matters raised in defense of a claim against the insured, the Supreme Court of Virginia distinguished the case from others in which it had strictly applied the eight corners rule, and held that the exception "require[d] consideration of an insured's claim that he or she caused bodily injury or property damage trying

7

to protect person or property in evaluating whether there is a duty to defend in a given case." Id. at 225.

Here, as Nautilus specifically acknowledges in its initial brief, the circumstances justifying the basis for an exception to the eight corners rule in Copp are not present in the instant case. While Nautilus contends that an exception to the rule should nonetheless apply, the court finds its arguments unpersuasive. In seeking the opportunity to rely on extrinsic evidence, Nautilus argues that such evidence will ultimately establish that Black & Veatch's claims are not covered by the policies, and that it therefore owes no duty to indemnify Strongwell. See, e.g., 12/11/12 Br. in Opp'n at 2 ("[T]here is no reason to require the contours of the underlying complaint to dictate Nautilus's coverage obligation through resolution of that litigation once facts extraneous to that matter establish that there is no coverage under the applicable policy."). This argument, however, conflates an insurer's duty to defend with its duty to indemnify. As set forth above, an insurer's obligation to defend an insured "is broader than its obligation to pay," and "arises whenever the complaint against the insured alleges facts and circumstances, some of which, if proved, would fall within the risk covered by the policy." Brenner, 397 S.E.2d at 102 (emphasis added). When such facts are alleged, "[t]he insurer has the obligation to defend the insured . . . even [if] the obligation to pay is not ultimately invoked." Va. Elec. & Power Co., 475 S.E.2d 264, 266 (Va. 1996); see also First Tenn. Bank Nat'l Assoc. v. St. Paul Fire and Marine Ins. Co., 501 F. App'x 255, 261 (4th Cir. 2012) ("If the evidence in First Tennessee's action shows that Global's actions were outside the scope of Global's authority as closing agent, St. Paul will have no obligation to indemnify Global for the judgment. The possibility that St. Paul might not ultimately be responsible for the judgment, however, has no effect on St. Paul's obligation to defend Global against First Tennessee's claims.").

Nautilus's argument is also unsupported by the plain language of the policies, which reinforces the court's conclusion that the eight corners rule governs its analysis of whether Nautilus has a duty to defend. As set forth above, the policies obligate Nautilus to defend an insured against "any 'suit' <u>seeking</u> damages" because of "bodily injury" or "property damage" to which the insurance applies. (Policies at § I, ¶ 1(a)) (emphasis added). The term "suit," in turn, refers to "a civil proceeding in which damages because of 'bodily injury' [or] 'personal property' . . . to which this insurance applies are <u>alleged</u>." (Id. at § V, ¶ 18) (emphasis added). When faced with identical or substantially similar language, courts have limited their analysis to the allegations in the underlying complaint. See, e.g., Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc., 618 F.3d 1153, 1172 (10th Cir. 2010) (holding that the same policy language "preclude[d] the admission of extrinsic evidence to determine the scope of [the insurer's] duty to defend"); <u>Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.</u>, 267 S.W.3d 20, 28-29 (Tex. 2008) (applying the eight corners rule of Texas insurance law, and emphasizing that the "policy itself . . . imposes on the insurer 'a duty to defend any' suit seeking damages for 'bodily injury' or 'property damages' covered by the policy, regardless of whether the plaintiff in the underlying suit has a legally meritorious claim"); <u>Knapp v. Eagle Prop. Mgmt. Corp.</u>, 54 F.3d 1272, 1283-84 (7th Cir. 1995) (looking to the four corners of the plaintiff's complaint to determine whether the insurer had a duty to defend, and emphasizing that "[t]he policy itself states that [the insurer] will 'have the . . . duty to defend any 'suit' <u>seeking</u> [covered] damages") (emphasis in original).

In sum, based on the existing case law and the plain language of the policies, the court is convinced that the determination of whether Nautilus owes a duty to defend Strongwell is governed by the eight corners rule and, thus, that the court must look "solely" to the language of the policies and the allegations of the underlying complaint to determine whether liability for any

9

claims therein is potentially covered by the policies. Capitol Envtl. Servs., Inc., 536 F. Supp. 2d at 640 n. 14. Accordingly, the court agrees with Strongwell that the issue is ripe for adjudication and that its motion for partial dismissal is not premature.

### B. <u>Insuring Clause</u>

In order to determine whether Nautilus has a duty to defend Strongwell, the court must determine whether the underlying action asserts any claims that are potentially covered by the policies. As noted above, the policies only apply to "bodily injury" or "property damage" caused by an "occurrence" that takes place in the coverage territory during the policy period. (Policies at § I, ¶ 1(b).) The policies define "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property." (Id. at § V, ¶ 17.) The policies define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Id. at § V, ¶ 13.) Although the policies do not define the term "accident," the Supreme Court of Virginia has held that "[t]he terms 'occurrence' and 'accident' are 'synonymous . . . and refer to an incident that was unexpected from the viewpoint of the insured.'" AES Corp., 725 S.E.2d at 536 (quoting Utica Mut. Ins. Co. v. Travelers Indem. Co., 286 S.E.2d 225, 226 (Va. 1982)).

In Count I of its amended complaint, Nautilus asserts that there was no "occurrence" giving rise to coverage under the policies, because the underlying action filed by Black & Veatch "alleges . . . faulty workmanship on the part of – and/or a defective product supplied by – Strongwell." (Nautilus Am. Compl. at 9.) Nautilus claims that defective work does not constitute an "occurrence" under the terms of the policy or applicable law.

Although the Supreme Court of Virginia has not been presented with this issue, federal courts applying Virginia law have considered whether damage caused by a subcontractor's

defective work constitutes an "occurrence" under a commercial general liability policy. These courts have drawn a distinction between a claim for the cost of repairing the subcontractor's own defective work and a claim for repairing damage to non-defective property resulting from the subcontractor's faulty workmanship.

"When an insured defectively performs a contract and the defective performance <u>only damages the insured's work or product</u>, the resulting contractual liability is expected for purposes of a commercial general liability insurance policy and therefore excluded from coverage." <u>Hotel Roanoke Conference Ctr. Comm'n v. Cincinnati Ins. Co.</u>, 303 F. Supp. 2d 784, 789 (W.D. Va. 2004) (emphasis added). The rationale behind this rule is that a commercial liability policy is not a performance bond and is not intended to insure the subcontractor's performance of a contract. <u>Id.</u> at 788-89. On the other hand, if a subcontractor's faulty workmanship results in damage to property other than the subcontractor's work product, there may be an "occurrence" triggering coverage under the policy. See <u>Stanley Martin Cos., Inc. v. Ohio Cas. Grp.</u>, 313 F. App'x 609, 614 (4th Cir. 2009) (holding that the contractor's obligation to replace defective trusses "was not unexpected or unforeseen under the terms of its building contracts for the townhouses," but that the damage which spread beyond the trusses to non-defective parts of the townhouses "was an unintended accident, or an occurrence that triggered coverage" under the policy); <u>Dragas Mgmt. Corp. v. Hanover Ins. Co.</u>, 798 F. Supp. 2d 758, 763 (E.D. Va. 2011) (applying <u>Stanley Martin</u> and holding that the replacement of defective drywall was not an occurrence under the policy, but that "any repair or replacement of non-defective components of the homes . . . or personal property of the homeowners constituted an occurrence").

In this case, the damages sought in the underlying action are not limited to the costs of repairing or replacing Strongwell's purportedly defective work product. Instead, the amended

11

complaint alleges, at least in part, that Strongwell provided a defective product that caused physical damage to other property, which Black & Veatch was required to repair. For instance, the amended complaint alleges that Strongwell's defective work resulted in "widespread physical damage to the Cardinal 1 and Cardinal 2 JBRs"; that "defective decks . . . could not be replaced without extensive damage to other property"; and that Black & Veatch "agreed to repair and replace the material and work of Strongwell and to repair and replace all of the physical damage caused by the material and work of Strongwell on the JBR Projects." (Black & Veatch Am. Compl. at ¶¶ 61, 69.)

Based on the foregoing, the court concludes that the allegations in Black & Veatch's amended complaint are sufficient to support the possibility of an "occurrence" under the policies, thereby giving rise to potential coverage. Accordingly, Count I must be dismissed to the extent that it claims that the absence of an "occurrence" relieves Nautilus of its obligation to defend Strongwell. See Parker v. Hartford Fire Ins. Co., 278 S.E.2d 803, 804 (Va. 1981) ("Only when it appears clearly [the insurer] would not be liable under its contract for any judgment based upon the allegations, does the company have no duty to defend.") (emphasis in original) (internal citation and quotation marks omitted).

In Count II of its complaint, Nautilus claims that there was no "property damage" as defined in the policies. As set forth above, however, Black & Veatch specifically alleges that Strongwell's defective work resulted in "widespread physical damage to the Cardinal I and Cardinal II JBRs," and that Black & Veatch was required to "repair and replace all of the physical damage" resulting from Strongwell's defective work. (Black & Veatch Am. Compl. at ¶¶ 61, 69.) In light of these allegations, the court concludes that the underlying complaint alleges facts which meet the policies' definition of "property damage" as "[p]hysical injury to tangible property,

including all resulting loss of use of that property." (Policies at § V, ¶ 17.) Accordingly, Count II must also be dismissed to the extent it seeks a declaration that an absence of "property damage" relieves Nautilus of its duty to defend.

In Count III of its amended complaint, Nautilus seeks a declaration that no property damage occurred "during the policy period" as required under the policies.[3] (Policies at § I, ¶ 1(b)(2).) To support this claim, Nautilus emphasizes that Black & Veatch's amended complaint references 2005 to 2007 as the time period during which it entered into agreements with AEP to perform engineering, procurement, and construction work for the JBR projects. Nautilus also notes that the amended complaint references May 2006 through December 19, 2006 as the time period during which Strongwell created and provided verified drawings for the JBR projects.

Having reviewed Black & Veatch's amended complaint and the applicable policy language, the court concludes that Count III must also be dismissed to the extent it seeks a declaration that Nautilus owes no duty to defend Strongwell. As Strongwell emphasizes in its initial reply brief, neither the dates of Black & Veatch's contracts with AEP, nor the dates on which Strongwell provided project drawings, is dispositive of this particular issue. Instead, the proper focus of the court's inquiry is on when the property damage occurred. Here, Black & Veatch's amended complaint alleges that the Cardinal 1 JBR experienced four outages "[f]rom November 2008 through September 2009" in order "to repair physical damages resulting from deficiencies discovered in the JBRs" and that the Cardinal 2 JBR experienced "six outages between December 2008 and August 2009, four of which were unscheduled, to repair physical damages resulting from deficiencies discovered in the JBRs." (Black & Veatch Am. Compl. at 59, 60). Such allegations are sufficient to support the possibility that the physical damage to these

---

[3] As set forth above, the policies cover the periods of December 31, 2007 to December 31, 2008, and December 31, 2008 to December 31, 2009.

units, or at least a portion of it, occurred during the coverage period of one or both of the policies at issue. Consequently, Count III of the amended complaint also fails to provide a valid basis upon which the court could declare that Nautilus has no duty to defend Strongwell.

### C. **Policy Exclusions**

In addition to asserting that that the allegations in the underlying action do not fall within coverage provisions of the policies' insuring clause, Nautilus also claims that the following policy exclusions relieve Nautilus of its duty to defend Strongwell: the Damage to Your Work and Damage to Your Product Exclusions (Count IV); the Damage to Impaired Property or Property Not Physically Injured Exclusion (Count V); the Recall of Products, Work or Impaired Property Exclusion (Count VI); the Contractual Liability Exclusion (Count VII); the Expected or Intended Injury Exclusion (Count VIII); and the Professional Liability Exclusion (Count IX). For Nautilus to be relieved of its duty to defend, the allegations in the underlying action must clearly and unambiguously establish that one or more of the exclusions apply to bar coverage for the claims asserted by Black & Veatch. See Fuisz, 61 F.3d at 245 ("[W]here both covered and excluded acts are alleged, the duty to defend attaches."); Floyd v. Northern Neck Ins. Co., 427 S.E.2d 193, 196 (Va. 1993) ("[T]o be effective, the exclusionary language must clearly and unambiguously bring the particular act or omission within its scope.").

With the exception of the Contractual Liability Exclusion cited in Count VII and the Professional Liability Exclusion cited in Count IX, Nautilus has conceded, in response to Strongwell's motions, that it cannot establish the applicability of the remaining exclusions without resorting to extrinsic evidence. (Nautilus Initial Br. in Opp'n at 17, n. 10.) For the reasons set forth above, the court may not consider extrinsic evidence in determining whether Nautilus owes a duty to defend. Instead, the eight corners rule requires the court to "compare the four corners of

the insurance policy against the four corners of the underlying complaint to determine if any allegations may potentially be covered by the policy." CACI Intern., Inc., 566 F.3d at 154; see also Solers, Inc. v. Hartford Cas. Ins. Co., 146 F. Supp. 2d 785, 791 (E.D. Va. 2001) ("[A]n insurer's duty to defend is determined solely by the claims asserted in the pleadings."). Accordingly, Counts IV, V, VI, and VIII are subject to dismissal to the extent Nautilus claims that the exclusions cited therein relieve Nautilus of its duty to defend. The court will proceed to consider the remaining exclusions.

1. **Contractual Liability Exclusion**

In Count VII of the amended complaint, Nautilus claims that coverage is precluded under the Contractual Liability Exclusion. The relevant portion of the Contractual Liability Exclusion provides that the policies do not provide coverage for:

> "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages: (1) That the insured would have in the absence of the contract or agreement.

(Policies at § I, ¶ 2(b).)

Upon review of the claims asserted in Black & Veatch's amended complaint, the court concludes that the Contractual Liability Exclusion does not relieve Nautilus of its duty to defend Strongwell. The amended complaint does not allege that Strongwell had any contract with Black & Veatch, or that Strongwell otherwise agreed to assume liability for any damages sought by Black & Veatch. Instead, the claims for property damage against Strongwell include tort claims and statutory causes of action for the alleged breach of obligations imposed by law, rather than by contract. For these reasons, the court agrees with Strongwell that the Contractual Liability Exclusion does not clearly and unambiguously encompass the claims asserted in Black & Veatch's amended complaint and, thus, that the exclusion does not relieve Nautilus of its duty to defend

15

Strongwell. Accordingly, Strongwell's partial motion to dismiss must be granted with respect to Count VII.

### 2. Professional Liability Exclusion

In Count IX of its amended complaint, Nautilus claims that it owes no duty to defend Strongwell in the underlying action because Black & Veatch's claims are barred by the Professional Liability Exclusion contained in an endorsement to the policies. The Professional Liability Exclusion provides in relevant part as follows:

> [T]his policy shall not apply to liability arising out of the rendering of or failure to render professional services, or any error or omission, malpractice or mistake of a professional nature committed by or on behalf of Named Insured in the conduct of any of the Insured's business activities.

(Professional Liability Exclusion Endorsement.)

Although the policies do not define the term "professional," this term is commonly used in insurance policies and, thus, many courts have had the opportunity to consider its application. Bohreer v. Erie Ins. Group, 475 F. Supp. 2d 578, 585 (E.D. Va. 2007). Numerous courts, including the United States District Court for the Eastern District of Virginia, have applied the definition of "professional" services set forth in Marx v. Hartford Acc. & Indem. Co., 157 N.W.2d 870 (Neb. 1968). See St. Paul Fire & Marine Ins. Co. v. Jacobson, 826 F. Supp. 155, 162 (E.D. Va. 1993) (noting that the Marx definition "has been widely adopted and used by courts in determining the scope of coverage of professional liability policies"); see also Zurich Am. Ins. Co. v. O'Hara Reg'l Ctr. for Rehab., 529 F.3d 916, 924 (10th Cir. 2008) ("The definition of professional services most frequently relied on by courts was first set forth in Marx v. Hartford Accident & Indemnity Co. . . . .")

In defining the term "professional," as used in the liability policy before it, the Marx Court held as follows:

16

> Something more than an act flowing from mere employment or vocation is essential. The act or service must be such as exacts the use or application of special learning or attainments of some kind. The term "professional" in the context used in the policy provision means something more than mere proficiency in the performance of a task and implies intellectual skill as contrasted with that used in an occupation for production or sale of commodities. A "professional" act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual. In determining whether a particular act is of a professional nature or a "professional service" we must look not to the title or character of the party performing the act, but to the act itself.

Marx, 157 N.W. 2d at 871-72.

Applying this definition, the court is unable to conclude that the Professional Liability Exclusion relieves Nautilus from having to defend Strongwell in the underlying action. While the exclusion may bar coverage for some of the underlying claims, which are based on engineering and design work performed by Strongwell and, thus, implicate the exercise of specialized knowledge or intellectual skill, Black & Veatch's amended complaint also includes allegations which "plausibly might . . . fall outside the exclusion," thereby triggering Strongwell's duty to defend. Bohreer, 475 F. Supp. 2d at 586.

For instance, in Count V of its amended complaint, Black & Veatch claims that a manufacturing defect in the Composolite panels supplied by Strongwell caused Black & Veatch to incur substantial damages. In particular, Black & Veatch alleges that damage to the JBRs was the result of a condition called "dry tow," a defect that arose because of an error in the manufacturing process, and that this defect was a direct and proximate cause of damage to property other than Strongwell's own products:

> 126. Significant portions of structurally crucial areas of the Composolite panels supplied by Strongwell for the JBR Projects had an apparent manufacturing defect known as "dry tow" – dry fiber bundles exterior to the corrosion-resistant veil and mat layers running in the length of a Composolite panel in the "machine direction" (i.e., in the same direction as the glass rovings in Composolite as the product is

17

pulled through the machine die). The appearance of a "dry tow" indicates that glass roving strands pulled through Strongwell's machine die were not fully and properly saturated with resin.

. . .

128. The existence of a "dry tow" significantly weakens the strength of Composolite, particularly in the transverse direction, which is already very weak even if correctly manufactured by Strongwell.

. . .

130. The weakness of Composolite in the transverse direction is a significant factor in the failures of Composolite that have been observed in the JBR Projects and was a proximate cause of the physical damage to Composolite and other tangible property that Black & Veatch was required to repair and/or replace at substantial expense.

(Black & Veatch Am. Compl. at ¶¶ 128-131).

Because the claim asserted in Count V of Black & Veatch's amended complaint alleges a purported manufacturing failure that is seemingly unconnected to the exercise of any specialized knowledge or intellectual skill, the court agrees with Strongwell that this claim does not clearly and unambiguously fall within the scope of the Professional Liability Exclusion. See, e.g., Transportes Ferreos de Venezuela II CA v. NKK Corp., 239 F.3d 555, 564 (3d Cir. 2001) ("[T]he exclusion for professional services is . . . appropriately associated with a specialized knowledge and a mental or intellectual endeavor, not production, manufacture or supply of goods and manufacturing. As such, the exclusion for professional services precludes coverage only if the damage arises out of a faulty design . . . , as opposed to faulty manufacture.") (internal citation and quotation marks omitted). Accordingly, the Professional Liability Exclusion does not relieve Nautilus of its duty to defend Strongwell, since Black & Veatch's amended complaint "plausibly might cover some set of facts that fall outside of the exclusion." Bohreer, 475 F. Supp. 2d at 586; see also Fuisz, 61 F.3d at 242 ("If a complaint, however ambiguous, may be read as premising

liability on alternative grounds, and either ground states liability potentially or arguably covered by the policy, the insured is entitled to a defense.").

For the reasons discussed above, the court concludes that Black & Veatch's amended complaint includes allegations which create a possibility of coverage under the policies' insuring clause, and which do not clearly and unambiguously fall within the scope of the exclusions cited by Nautilus. Therefore, the allegations are sufficient to trigger a duty to defend Strongwell, and Nautilus's amended complaint must be dismissed insofar as it seeks a declaration to the contrary.

## II. **Motion to Stay**

Strongwell has also moved to stay any proceedings related to the question of whether Nautilus owes a duty to indemnify Strongwell until the underlying action has been resolved. For the following reasons, the motion will be granted in part and denied in part.

The duty to indemnify "refers to an insurer's responsibility to pay a monetary award when its insured has become liable for the covered claim." Nationwide Mut. Ins. Co. v. Overlook, LLC, 785 F. Supp. 2d 502, 513 (E.D. Va. 2011) (internal citation omitted). Unlike the duty to defend, which "is based on the allegations in the underlying complaint, the duty to indemnify relies on litigated facts." CACI Int'l, Inc., 566 F.3d at 155. Accordingly, courts have generally held that it would be "premature" to rule on the plaintiff's duty to indemnify while the underlying action remains pending. Penn-America Ins. Co. v. Mapp, 461 F. Supp. 2d 442, 458 (E.D. Va. 2006); see also First Tenn. Bank Nat'l Assoc., 501 F. App'x at 261-62 (holding that the district court's ruling on the indemnification issue was premature, and that the issue would be ripe for reconsideration by the district court upon the resolution of the underlying action); Anthem Cas. Ins. Group Affirmative Ins. Co. v. Roberts, 49 Va. Cir. 154, 155 (Roanoke City Cir. Ct. 1999)

(holding that a decision regarding the insurer's obligation to indemnify the insured for a judgment arising out of a pending personal injury case would be premature).

At the present time, the court finds no persuasive basis to depart from the general rule outlined above. Unless there is an inordinate delay in the proceedings pending in the Western District of Missouri, the court will refrain from ruling on the indemnification issue until the underlying action is resolved. In the meantime, the court will permit Nautilus to propound requests for production of documents on Strongwell. However, all other discovery applicable to the indemnification issue will be stayed pending the resolution of the underlying action.

## Conclusion

For the reasons stated, Strongwell's motion for partial dismissal of the amended complaint will be granted, and its renewed motion to stay proceedings will be granted in part and denied in part. The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 4th day of June, 2013.

*/s/ Jackson Conrad*

Chief United States District Judge